**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| DENISE FITZPATRICK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF HOBART, *et al.*, | ) | No. 2:03-CV-359 PS |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2001 and 2002, the Plaintiffs, two African-American families, moved into the predominantly white neighborhood of 5th and Rush Streets in Hobart, Indiana. Almost immediately upon their arrival, Denise Fitzpatrick and her children (the "Fitzpatrick Family") felt that they were harassed by the Hobart police department and the Hobart schools based on the color of their skin. Ralph and Sandra Harris and their children (the "Harris Family") had a similar experience when they moved into the neighborhood six months later. Then, in August 2002, a group of white neighbors from the Plaintiffs' neighborhood attended a meeting of the Hobart Common Council to lodge a series of complaints against the Plaintiffs including allegations of theft, vandalism, and threatening or aggressive behavior. Defendants Leo and Ruby Kundrat were among this group of neighbors. According to the Plaintiffs, the Hobart police department, the Hobart building commission, and Hobart schools stepped up their contact with the Plaintiffs after the Council meeting to the point where the Plaintiffs felt harassed. Having had enough, both families ultimately moved out of Hobart.

1

The Plaintiffs brought this lawsuit against the City of Hobart, various City of Hobart government officials, the Hobart Police Department, various individual Hobart police officers, and two white families in their neighborhood: Joseph and Lillian Sullivan, the Fitzpatricks' next door neighbors, and Leo and Ruby Kundrat who lived down the street from the Fitzpatricks.[1] The Plaintiffs allege violations of a number of federal and Indiana state laws all arising out of the allegedly racially discriminatory actions taken by various defendants.

This matter is now before the Court on the Motion for Summary Judgment brought by Defendants Leo and Ruby Kundrat [Doc. 54]. We find that the Kundrats did not participate in a conspiracy with Hobart government officials to deprive the Plaintiffs of equal protection under the law, did not deprive the Plaintiffs of any cognizable property right, and did not commit outrageous acts to cause the Plaintiffs emotional distress. The Kundrats' motion is therefore **GRANTED.**

## BACKGROUND

The basis for the Plaintiffs' claims against the Kundrats is murky at best. In response to various defendants' separate motions for summary judgment,[2] the Plaintiffs filed a single "consolidated appendix" that did little to separate out the factual basis for their claims against each defendant. Instead, the Plaintiffs seem to allege that each and every defendant is liable for the allegedly discriminatory acts of the others as part of an over-arching conspiracy. As

---

[1] The Plaintiffs also brought suit against the School City of Hobart. The Plaintiffs and the School City have reached a settlement in principle.

[2] Defendant City of Hobart and School City of Hobart also filed motions for summary judgment. On August 18, 2006, the Court vacated the School City's motion with its permission because the Plaintiffs and the School City represented that they reached a settlement in principle. The City's motion remains pending before this Court and will be resolved in a separate order.

2

discussed below, that is not automatically the case. Therefore, this factual summary represents the Court's best efforts to separate out those facts pertinent to the Kundrats for purposes of their motion.

A.      **The Parties**

The Fitzpatrick Family moved into their home at 522 Rush Street, Hobart, in December 2001. They rented their home from Plaintiff John Hanna through the Section 8 program.[3] The Harris Family moved to their home at 521 Pershing Street, Hobart, in July 2002. The Harris family home was across the alley from the Fitzpatricks and the children quickly became good friends.

The Kundrats, a Caucasian family, live at 535 Rush Street, just down the way from the Fitzpatrick Family. However, it appears that direct contact between the Plaintiffs and the Kundrats was very minimal. Ruby Kundrat testified that she never met or had any conversations with Denise Fitzpatrick or with any member of the Harris family. Similarly, neither the Harrises nor Denise Fitzpatrick recall having any conversations with Ruby Kundrat. Ruby did speak to some of the Fitzpatrick children on two occasions. On one occasion she "yelled" at some of the kids to get away from her mailbox, but she could not confirm if the children had even heard her. On the second, two Fitzpatrick children came to their door to sell electronic equipment. Ruby testified that she merely warned them to watch out for the dog and not to come back into the yard.

---

[3] The Kundrats' motion for summary judgment does not address Mr. Hanna's claims. This makes sense because it appears that Hanna has not actually sued the Kundrats. Therefore, we agree with the Kundrats that Mr. Hanna's claims are brought only against the City of Hobart and its building commission.

**B.     The Allegedly Discriminatory Acts**

It is difficult to discern from the briefing exactly which alleged acts of discrimination the Plaintiff attribute to the Kundrats.  After spending a significant effort sifting through a convoluted record, we have identified four specific events that seem to encompass the bulk of the Plaintiffs' claims against the Kundrats.  They are: 1) an August 7, 2002 meeting with the Hobart Common Council; 2) a September 7, 2002 meeting with the Hobart Common Council; 3) a meeting at the Hobart police department; and 4) Leo Kundrat taking pictures of neighborhood children (including the Fitzpatrick and Harris children) at the school bus stop.  The Plaintiffs also assert that because the Kundrats were familiar with or social with a number of Hobart government officials, they must have been "in cahoots" with the City of Hobart in the City's alleged efforts to harass the Plaintiffs right out of Hobart.

**1.     The August 7, 2002 Council Meeting**

The Plaintiffs' allegations against the Kundrats initially arise out of Ruby Kundrat's position as *de facto* spokeswoman for the neighborhood at an August 7, 2002 Council meeting. According to Ruby, the Kundrats attended the Council meeting because some of the younger Fitzpatrick children were getting into her mailbox,[4] a problem that she noticed almost as soon as they moved into the neighborhood.   Apparently other neighbors on Rush street also had complaints about the Fitzpatrick and/or Harris children including public urination, vandalism, and theft.  As a result, the neighbors decided to attend a Council meeting to air their grievances. Ruby did not contact or speak to any Council member before the meeting.

---

[4]Because the section of Hobart at issue in this case used to be a rural route, the mailboxes are not located in front of each resident's house.  Instead, the mailboxes are grouped together on Rand Road, up the street from the block in question.

The Kundrats and approximately 20 other neighbors attended a Council meeting on August 7, 2002. At the end of the meeting, the Council provided an open microphone to Hobart citizens to voice various community concerns. Ruby Kundrat spoke at the August 7, 2002 meeting and raised a number of concerns regarding the Fitzpatrick and Harris families. She reported the following problems:

   a. One of the Harris or Fitzpatrick sons allegedly threatened another neighborhood boy with a gun;

   b. The Fitzpatrick children were going through the mail at the neighborhood mailboxes;

   c. The Fitzpatrick and/or Harris children were going door to door and asking for money;

   d. The Fitzpatrick children were going door to door trying to sell electronic equipment;

   e. The children play in other peoples' yards without asking permission;

   f. The children urinate on the street and/or in neighborhood yards;

   g. The children steal bikes and skateboards from other neighborhood kids; and

   h. Instances of loud music played throughout the night – sometimes as late as 3:00 a.m.

(Plf. Ex. 24). Ruby Kundrat testified at her deposition that she did not witness all of these complaints personally, but rather was enlisted to speak for various neighbors. The transcript of the August 7 meeting also demonstrates that a variety of unidentified neighbors raised concerns about the Harris and Fitzpatrick families independent of Ruby's list. Leo Kundrat did not speak at the meeting.

At the meeting, Mayor Linda Buzinec repeatedly told the neighbors that the City would look into their complaints and that they would do what they could to alleviate the problems. The

Mayor even offered to bring the police chief and building inspector out with her to have a neighborhood meeting.  Ruby testified in her deposition that neither she nor her husband took part in any follow-up meeting.  It is not clear whether a meeting with the Mayor, the police chief, and any members of the neighborhood ever took place as offered.  Police Chief Brian Snedecor also asked that the neighbors call 911 to report events as they occur so that the police could deal with them.[5]   The Kundrats testified that they did not feel they really received any response to the complaints from either the Mayor or the Police Chief at the August 7, 2002 meeting.

### 2. The September 7, 2002 Council Meeting

The neighbors attended a second Council meeting on September 7, 2002 with Ruby Kundrat again acting as a spokesperson.  The purpose of their presence at the second meeting was two-fold.  First, Ruby reiterated the concerns that they raised at the first meeting and indicated that they had not been resolved.  Second, Ruby informed the Council of an incident in which two of the Fitzpatrick sons apparently got into a fight with defendant Joe Sullivan, the Fitzpatricks' next door neighbor.  Again, the Mayor and Police Chief counseled the neighbors to call the police every time there is an incident that concerns them.  The transcript of the second meeting reveals that as the meeting progressed, a number of unidentified neighbors on Rush and Pershing streets were quite upset about the alleged problems with the Fitzpatrick and Harris children and several made requests that the police speak with them and/or issue citations based on past events.   The transcript is somewhat difficult to follow in that it appears that many

---

[5]The Plaintiffs repeatedly cite to an article published in the Times, a local newspaper, as a record of what occurred at the August 7, 2002 Council meeting.  Although the Plaintiffs purport to have provided the text of the entire newspaper article in a footnote of their brief, they did not identify the article by date or by-line nor did they supply the Court with a copy of the article.  Accordingly, we do not consider the Times article in our analysis.

unidentified neighbors were speaking over one another raising a variety of different concerns. We also note that unlike the first meeting, this second meeting did contain certain racial overtones. Several of the neighbors complained that the Plaintiffs used racial slurs and accused them of belonging to the Ku Klux Klan. One of the neighbors, identified as Les Nagy, went so far as to compare the Plaintiffs with bank robbers and noted that if the City did not stop the problems, the community would be nurturing criminals.

However, according to the transcript, neither Ruby nor Leo Kundrat took part in this portion of the meeting. Ruby did not request that the police visit either family nor did she ask that anyone be issued a citation or arrested based on any past event. Neither Ruby nor Leo Kundrat made any racially derogatory statement. Again, Leo Kundrat did not speak at the meeting at all. At one point during the meeting, Chief Snedecor suggested that Ruby act as a spokesperson and call the police department with an "activity report" every morning. The transcript does not reflect whether Ruby accepted that suggestion and there is no evidence that either Kundrat communicated with the Hobart police department or any other Hobart governmental agency on a regular basis. In fact, the Court's review of police records that the Plaintiffs provided in reference to the Fitzpatrick residence reveals that the Kundrats never called the police to complain about anything at 522 Rush Street. Indeed, Ruby Kundrat testified in her deposition that she was reluctant to call the police about the mailbox issue because she didn't want to get the children in trouble, she just wanted them to stop going through her mail.

    **3.**    **The Hobart Police Department Meeting**

Ruby Kundrat attended a meeting with the chief of police and John Hanna, the Fitzpatrick's landlord. The record does not reflect who called the meeting or how Ruby learned

7

of the meeting. At this meeting, Ruby again complained that the Fitzpatrick children were "getting into" her mailbox. Apparently other neighbors also attended the meeting to make various complaints, but we do not have the details of their portions of the conversation. Neither party provided the Court with much information about the substance of this meeting.

### 4. Leo Kundrat's Photography

Finally, the Plaintiffs allege that Leo Kundrat followed their children and took pictures of them while they were out in the streets. Leo testified at his deposition that he took pictures of all of the neighborhood children standing on the street while they were waiting for the school bus. Leo felt harassed by the children on the street because they would block the road when he was driving around the neighborhood. Leo further testified that the children were not just the Fitzpatrick and Harris children, but a number of Caucasian children in the neighborhood as well. Ultimately, Leo did not give the pictures to the School Board because the children stopped blocking his use of the street.

### 5. The Kundrat's Relationships with Various Hobart Officials

Purportedly as evidence of a conspiracy between the Hobart government and the Kundrats, the Plaintiffs stress that various council members knew Ruby by name and that Leo frequently had coffee in the same restaurant as the Building Commissioner. However, while Ruby and Leo Kundrat do not deny that they knew various members of the Council and the Building Commissioner, they deny ever having any conversations with any of those government officials about the Fitzpatrick or Harris families other than the statements that Ruby made at the two Council meetings. The Kundrats also deny ever speaking with any official from the Hobart schools or making any complaints to the Hobart Building Commissioner regarding the condition

8

of the Fitzpatrick or Harris households.  The Plaintiffs have not provided the Court with any evidence to the contrary.

## DISCUSSION

### A.	Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party.  *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party.  *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999).  The non-moving party must support its contentions with admissible evidence and may not rest upon mere allegations in the pleadings or conclusory statements in affidavits.  *Celotex*, 477 U.S. at 324.  The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial.  The production

of only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Anderson*, 477 U.S. at 252.

**B.     Waived Claims**

As an initial matter, we dispose of those claims that the Plaintiffs have admitted do not pertain to the Kundrats. At oral argument, the Plaintiffs conceded that their claims brought under Title VI, 42 U.S.C. § 1981, the Fair Housing Act, and all Indiana state law claims (except intentional and/or negligent infliction of emotional distress) do not apply to the Kundrats. Accordingly, we need not address these claims.

**C.     Remaining Claims**

We are, thus, left with three primary claims against the Kundrats. First, the Plaintiffs allege that the Kundrats violated 42 U.S.C. §§ 1983, 1985, and/or 1986 by engaging in a conspiracy with various Hobart government officials and/or agencies to discriminate against them and, ultimately, drive them out of Hobart. Second, the Plaintiffs allege that the Kundrats violated 42 U.S.C. § 1982 by interfering in their right to live in Hobart, Indiana. Finally, the Plaintiffs allege that the Kundrats acts violated Indiana state law by negligently or intentionally inflicting emotional distress upon them. We take each claim in turn.

**1.     The Conspiracy Claims**

In their brief, the Plaintiffs concede that the Kundrats are private citizens who cannot ordinarily be held liable under § 1983. However, they assert that the Kundrats are subject to § 1983, § 1985, and § 1986 liability in this case because they conspired with Hobart government officials to deprive the Plaintiffs of their civil rights.

42 U.S.C. § 1983 creates a federal cause of action for "the deprivation under color of

10

[state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Malesevic v. Tecom Fleet Servs. Inc.*, 72 F. Supp. 2d 932, 937 (N.D. Ind. 1998) (internal quotations omitted). Thus, the Plaintiffs must show that the defendants both 1) deprived them of a right secured by the Constitution or the laws of the United States; and 2) that the defendants acted under color of state law. *Brokaw v. Mercer County*, 235 F.3d 1000, 1008 (7th Cir. 2000). As the Plaintiffs concede in their brief, ordinarily, the protections afforded by § 1983 do not extend to private conduct that infringes upon individual rights. *Malesevic*, 72 F. Supp. 2d at 937. However, private conduct may be treated as state action (subject to § 1983 liability) if "the private party willfully participates in a conspiracy with the state or one of its employees to commit the alleged conduct." *Id*.

Claims pursuant to § 1985 and 1986 are similar to § 1983 claims in that both require the existence of a conspiracy between private and public actors. *Brokaw*, 235 F.3d at 1024. To prevail on a § 1985 claim, the plaintiffs must demonstrate: 1) a conspiracy; 2) for the purpose of depriving a person or class of persons of equal protection of the laws; 3) an act in furtherance of the conspiracy; and 4) an injury to person or property or a deprivation of a right or privilege. *Id*. 42 U.S.C. § 1986 provides a cause of action where a defendant with the power to prevent a civil rights conspiracy knows of it, but neglects to do anything to prevent the discriminatory acts from occurring. 42 U.S.C. § 1986. Thus, a claim under § 1986 is not viable if there is no conspiracy under § 1985. *Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992).

In this case, the Plaintiffs' §§ 1983, 1985, and 1986 claims all must fail because the Plaintiffs have not presented any evidence that the Kundrats were involved in a conspiracy with any Hobart city official, police official, or school official to deprive the Plaintiffs of any right.

11

To establish the existence of such a conspiracy under § 1983 or § 1985, the plaintiff must show:

> (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents.

*Brokaw*, 235 F.3d at 1016.  It is, however, not enough for a private citizen to have furnished information to law enforcement or other government officials even if that information is false. *Holdeman v. Consolidated Rail Corp.*, 649 F. Supp. 1188, 1196 (N.D. Ind. 1986).  Instead, the plaintiff "must present evidence of some concerted effort, scheme or customary plan between the State officials and private parties."  *Id*; *see also Kelley v. Mylar*, 149 F.3d 641, 649 (7th Cir. 1998) (holding that a plaintiff did not show a conspiracy where he failed to demonstrate that state officials and private actor reached an understanding or agreement to deprive her of a constitutional right).

The Plaintiffs correctly note that a conspiracy may be proven by circumstantial evidence. *See*, *e.g.*, *Hernandez v. Joliet Police Dept.*, 197 F. 3d 256, 263 (7th Cir. 1999).   However, in this case, they have not presented *any* evidence of a concerted effort, scheme or plan that would demonstrate that the Kundrats and Hobart officials entered into an understanding intended to deprive the Plaintiffs of their rights.  At most, the Plaintiffs have shown that on three separate occasions, the Kundrats complained to City of Hobart officials regarding problems that the Fitzpatrick and/or Harris children allegedly caused in the neighborhood.  At each of these meetings, the Council and the police responded by counseling the Kundrats (and their neighbors) to call the police to report problems as they occurred.  This does not create an inference of conspiracy.

Moreover, the Kundrats' personal relationships, however limited, with certain Hobart

officials do not create an inference of conspiracy.  Leo Kundrat testified that while he had coffee at the same restaurant each morning as a Hobart official, they never discussed the Fitzpatrick or Harris Families.  Further, although Police Chief Snedecor and Mayor Buzinec invited Ruby Kundrat to meet with them separately to more thoroughly discuss the neighborhood problems, Ruby testified that she did not meet regularly with the Chief nor did she ever meet privately with the Mayor.  The Plaintiffs have not presented any evidence to rebut the Kundrats' testimony.

Simply, the Plaintiffs have not presented any evidence that the Kundrats ever spoke with the Mayor, the police chief, the building commissioner, or any other Hobart official outside of these three incidents.  In fact, the log of police calls detailing complaints against the Fitzpatrick Family reveals that the Kundrats never even called 911 to report any problems.  There is simply no evidence of communication between the Kundrats and Hobart officials, let alone evidence of the type of known agreement necessary to support a civil rights conspiracy claim.  *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir. 1999) (holding that there is no conspiracy absent evidence of an expressed or implied agreement among alleged coconspirators).  Accordingly, the Kundrats' motion for summary judgment on the Plaintiffs' §§ 1983, 1985, and 1986 claims is **GRANTED**.

  **2.** **Section 1982 Claims**

The Plaintiffs did not address their § 1982 claims against the Kundrats at oral argument nor did they do anything to advance their claims in the response brief other than to "incorporate" their responses to motions for summary judgment brought by other defendants.  This, alone, could allow the Court to reject their claims for failure to comply with Local Rule 56.1.  However, out of an abundance of caution, we address the merits of the Plaintiffs Section 1982

claims and, ultimately, find that they do not survive summary judgment.

Section 1982 guarantees to all citizens of the United States, "the same right . . . as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property." *Lac Du Flambeau v. Stop Treaty Abuse – Wisconsin, Inc.*, 991 F.2d 1249, 1257 (7th Cir. 1993). To show a violation of 42 U.S.C. § 1982, a plaintiff must demonstrate that the defendant interfered with the plaintiffs property rights and that such interference was motivated by racial animus. *Id.*

In this case, the Plaintiffs fail to demonstrate which of their various property rights the Kundrats' allegedly violated. Instead, they direct the Court to their response to the School City of Hobart's motion for summary judgment in which they argue that the school's alleged interference with the children's ability to obtain a public education interferes with the Plaintiffs' "colloquial bundle of property rights." (See Plf. Resp. to School MSJ at 9). There is no evidence in the record that the Kundrats participated in any actions allegedly taken by the School City.

Further, the Plaintiffs have cited no legal support for the proposition that their decision to leave a community based on neighborhood racial animus (perceived or actual) gives rise to a claim under § 1982 for deprivation of property rights. Nor has this Court been able to identify any decision in which § 1982 was approved as a sort-of omnibus fix for racial discrimination amongst neighbors. Instead, the cases addressing property rights are much more specific and address specific acts of discrimination by lessors, sellers, condominium or community associations, and the like. *See*, *e.g.*, *George v. Colony Lake Property Owners Ass'n.*, 2006 WL 1735345 (N.D. Ill. June 16, 2006) (holding that plaintiffs' complaint stated cause of action for §

14

1982 violations where defendant association drafted by-law which prohibited rental of townhomes and, thereby, effectively excluded all African-Americans from the community); *Calderon v. Southwest Bell Mobile Systems, LLC*, 390 F. Supp. 2d 714 (N.D. Ill. 2004) (dismissing § 1982 claim where defendant did not refuse to sell or lease property to plaintiff, but rather refused to enter into franchise agreement effectively preventing plaintiff from doing business in a particular community); *Guides Ltd. v. Yarmouth Group Property Mgmt., Inc.*, 295 F.2d 1065 (10th Cir. 2002) (upholding jury verdict for plaintiff where defendant refused to renew lease of African American business owner despite fact that she was model tenant); *Chauhan v. M. Alfieri Co., Inc.*, 897 F.2d 123 (3rd Cir. 1990) (shopping center denied lease application of Indian national).

In this case, the Plaintiffs have failed to allege any specific property right or any specific action by the Kundrats that might have purportedly infringed upon that property right. Accordingly, the Kundrats' Motion for Summary Judgment as to the Plaintiffs § 1982 claim is **GRANTED.**

### 3. Emotional Distress

Lastly, the Plaintiffs assert that the Kundrats intentionally inflicted emotional distress upon them through their allegedly discriminatory acts.[6]  Here, too, the Plaintiffs' claims must

---

[6]The Plaintiffs also purport to bring a claim for "negligent infliction of emotional distress."  The Indiana courts have recently clarified that negligent infliction of emotional distress is not an independent tort, but rather addresses emotional impacts that a plaintiff suffers because of a defendant's otherwise negligent act.  *Doe v. LaFayette Sch. Corp.*, 846 N.E.2d 691, 701(Ind. App. 2006); *Ryan v. Brown*, 827 N.E.2d 112, 118-119 (Ind. App. 2005).  In this case, the Plaintiffs have not asserted any negligence claim against the Kundrats or any other defendant.  Accordingly, we do not consider their claim for negligent infliction of emotional distress.

15

fail.

The Indiana Supreme Court first recognized IIED as a tort in 1991 when it said that "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991); *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind. Ct. App. 2001). Under Indiana law, conduct is extreme and outrageous:

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002); *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999).

Quite simply, the Plaintiffs have not alleged a single action undertaken by Ruby or Leo Kundrat that rises to the level of outrageous conduct required to support a claim for intentional infliction of emotional distress. Ruby Kundrat spoke at two Council meetings and attended a meeting with the Hobart police department. Leo Kundrat attended the Council meetings and took pictures of children in the street. Nothing in those acts, by themselves, are outside the norms tolerated by society. Moreover, even if, for the sake of argument, we were to infer some sort of racial animus in the Kundrats' comments or actions, their activities still would not rise to the level of "outrageous" conduct. *See Rosa v. Valparaiso Comm. Sch. Dist.*, 2006 WL 487880 at *7 (N.D. Ind. Feb. 27, 2006) (holding that defendants' use of racial slurs did not amount to extreme and outrageous behavior for purposes of IIED claim).

Because we do not find the Kundrats' words or actions to be outrageous, the Plaintiffs

16

cannot maintain their claim for intentional infliction of emotional distress.  The Kundrats' Motion for Summary Judgment is, therefore, **GRANTED** as to this claim.

## CONCLUSION

For the foregoing reasons, the Kundrat's Motion for Summary Judgment [Doc. 54] is hereby **GRANTED**.   The Plaintiffs' claims against the various City of Hobart defendants remain pending and the City's motion for summary judgment shall be addressed in a separate order.

**SO ORDERED.**

ENTERED: September 25, 2006

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
